BETH ISRAEL HOSPITAL ASSOCIATION and Others, on Behalf of Themselves and All Other Owners of Property Abutting on Stuyvesant Square in the County and City of New York, Similarly Situated, Respondents, *v.* ROBERT MOSES, Commissioner of Parks, and THE CITY OF NEW YORK, Appellants.

First Department, April 16, 1937.

*Jeremiah M. Evarts* of counsel [*Thomas W. A. Crowe* with him on the brief; *Paul Windels, Corporation Counsel*], for the appellants.

*Thomas I. Sheridan* of counsel [*William H. Hayes* and *Harry C. Kane* with him on the brief; *Hartman, Sheridan & Tekulsky*, attorneys], for the respondents.

MARTIN, P. J.  The owners of hospitals abutting on Stuyvesant square, city of New York, have brought this action on behalf of themselves and other persons similarly situated to enjoin the construction in said square by the commissioner of parks of playgrounds for children.

Stuyvesant square comprises the area between Fifteenth and Seventeenth streets extending 190 feet east and 190 feet west of Second avenue.  It is thus divided by Second avenue into two small squares.  Each square is so small that no part of it can be set aside for a modern playground without diverting it from the purpose for which it was dedicated.  The proposed plan of the commissioner of parks contemplates the removal of the lawns in the southerly half of each portion of the square and the substitution of concrete; the erection of shuffleboard courts, parallel bars, play houses, ping pong tables, swings, a wading pool, showers and other apparatus.  Around the playground in the southerly half of each square will be placed a high iron fence with a gate which it is said will be locked at night and opened each morning.  The amount of space to be taken by the playground and gymnastic apparatus around which the fence is to be erected is stated to be one-twelfth of each square.  However, since this playground is to be in the center of the southerly half of each square and the space outside the fence will be merely a border around the playground, the practical result would be a diversion of the whole southerly half of each square to the use of a playground.  This case is thus obviously distinguishable from the case of a large park, where a playground might be placed in a favorable location without changing its general character.

Plaintiffs are hospitals caring for the sick, and to a large extent for the poor who are sick.  Peace and quiet are necessary to the well-being of the patients.  One witness stated that Beth Israel Hospital selected its site because Stuyvesant square " was a very pleasant, quiet, beautiful park. * * * It was that restricted area and the quietness of the place that caused us to purchase the ground at a cost of about $350,000."  To preserve the quiet so much needed by the sick some of the streets surrounding Stuyvesant square have been declared hospital streets and signs have been posted by the city authorities warning persons traveling on said

streets to refrain from making unnecessary noise. It would be manifestly incongruous to establish playgrounds in proximity to such signs. In recent years the supervision and care of the park have diminished, and the peace and quiet which formerly prevailed have not been preserved.

The shortest distance from the proposed easterly play area to the Beth Israel Hospital is 135.47 feet; to the New York Infirmary, 92.54 feet; to the Salvation Army Hospital, 154.60 feet; to the Booth Memorial Hospital, 131.29 feet; to the Manhattan General Hospital, 377 feet, and to the St. Andrew's Convalescent Hospital, 476.11 feet. The shortest distance from the proposed play area in the westerly rectangle to the Beth Israel Hospital is 381.75 feet; to the New York Infirmary, 376 feet; to the Salvation Army Hospital, 372.60 feet; to the Booth Memorial Hospital, 321.40 feet; to the Manhattan General Hospital, 346 feet, and to the St. Andrew's Convalescent Hospital, 349.12 feet.

The building of these playgrounds naturally will attract children to Stuyvesant square. That is the purpose intended. The playground in the easterly square is designated as a playground for high school children. It should be noted that within half a block of the easterly square is Stuyvesant High School with more than four thousand students. Washington Irving High School for Girls, which has a large attendance, is located on Irving place between Sixteenth and Seventeenth streets.

The court at Special Term has enjoined the construction of the proposed playgrounds as violative of the dedication of the lands for use as an ornamental public square. Not only the covenants contained in a deed but the equities of the situation entitle the respondents to relief.

The plaintiffs and all owners of property abutting on Stuyvesant square have taken title through mesne conveyances from the heirs of Peter G. Stuyvesant. The latter deeded the lands comprising Stuyvesant square to the city of New York for use as a public square upon certain conditions. Those conditions are contained in a private grant for a special purpose and are to be strictly construed in favor of the grantor and those claiming under him, in contradistinction to the liberal construction as to the use of land which has been acquired for public use by condemnation or purchase. (*Williams* v. *Gallatin*, 229 N. Y. 248, 253.)

The defendants contend that since the deed provides in unambiguous language merely that the lands should be used as a "public square," it was error to qualify said term by the addition of the word "ornamental" by reference to recitals in a complaint

filed by the donor in an action against the city of New York. It is not necessary, however, to rely upon such recitals. The deed itself defines the character of the public square contemplated by the donor. In addition to the provision that the lands shall be "used exclusively for the purpose of a public square," it provides that they should be inclosed "with a railing similar to the one which shall be placed round Union Place in the said City and plant and improve such inclosures similar to the improvements made in Washington Square in the said City of New York." Said deed further provides that "in case the said lands hereby conveyed should at any time hereafter cease to be used for the purpose of such public square *as aforesaid* then these presents and everything herein contained shall be void." The words " as aforesaid " indicate that it was not an unqualified use as a public square that was contemplated by the deed but a park-like square of the general character of Washington square as it then existed. The purpose was to enhance the value and to improve the surrounding property. Any changes must be improvements in fact and not detrimental to the square.

The subsequent acts of the parties confirm the fact that a park-like square was intended by the donor, not a playground. The city having failed to inclose and improve the lands as agreed, the donor brought an action for breach of said covenants and recovered a judgment awarding him damages. Subsequently he brought an action against the city to compel specific performance of its covenants in respect to said lands. The defendant demurred upon the ground the covenants to improve in a particular manner had been merged in the judgment at law awarding damages for their breach, and could not thereafter be enforced. The demurrer was overruled by the vice-chancellor. Upon appeal by the city, the chancellor held that the conditions and covenants to inclose and improve in a particular manner were merged in the recovery in the action at law. (*Stuyvesant* v. *Mayor, Aldermen and Commonalty of City of New York*, 11 Paige, 414.) He further held that the condition and covenant that the land should be forever used as a public square was a continuing covenant for which specific performance would lie. Inasmuch as the demurrer was to the whole bill, the decree overruling the demurrer was affirmed with leave to the defendant to plead the judgment at law in bar to so much of the relief as sought specific performance of the covenant to regulate and improve in a particular manner. It is to be noted, however, that in the final decree of August 21, 1845, it was adjudged and decreed: "That the defendants be perpetually enjoined and restrained from using the lands and premises in the Bill of Com-

plaint described as forming Stuyvesant Square, or suffering or permitting the same to be used for any other purpose than that of a Public Square *for the purposes in the Bill of Complaint described,* and in the deed of covenant and grant therein contained set forth." (Italics mine.) The bill of complaint refers to the taste, beauty and embellishment of the square; the requirements of the covenant in the deed have already been referred to. The chancellor having also held that the complainant was not entitled to all the relief specifically prayed for, Peter G. Stuyvesant, the donor, in October, 1845, appealed to the Court for the Correction of Errors (later our Court of Appeals) from that part of the decree which denied specific performance of the covenants immediately to regulate the land, erect an iron railing of a certain type, and plant and improve in the same manner as Washington square was improved. The city of New York did not appeal from the chancellor's decree.

Pending said appeal the common council appropriated $20,000 for inclosing Stuyvesant square with " a neat, elegant and strong iron railing." Such a railing was erected and the square laid out with grass and planted with trees and shrubbery. The executors of the donor thereupon offered to withdraw the action if the city would, among other things, repay the counsel fees paid by the donor and install two fountains. The board of aldermen thereafter adopted a resolution accepting said offer upon a report of the finance committee that in their opinion " it will be best to avoid the chances of a legal decision by making an amicable settlement of the controversy." Upon said resolution becoming effective a stipulation consenting to the dismissal of the appeal was signed and an order entered in the Court of Appeals on June 26, 1849, dismissing the appeal, with costs against the city.

The controversy with respect to the character of the public square was thus settled by the development of a park-like inclosure beautified by lawns, shrubbery, trees, winding walks and fountains. In that condition it has been maintained for almost one hundred years. In that condition substantially the city is obligated to maintain it in perpetuity.

The argument that the city has a right to place playgrounds in Stuyvesant park because of the fact that in recent years it has been overrun by children does not aid the appellants' contention. If Stuyvesant park has not had the care which it was agreed it should be given in the deed of dedication or the care which the city was directed to give it in the judgment of the Court of Chancery, that is the fault of the city. The appellants cannot now base a

right to install a playground on the fact, if it be the fact, that they have heretofore failed in their duty properly to maintain the park.

Playgrounds concededly are desirable. Their maintenance, however, results in a great amount of noise. They should not, therefore, be located with complete disregard for the rights of others, especially in view of the fact that there are any number of places in the vicinity sufficiently distant from hospitals for such a purpose.

The judgment should be affirmed, with costs.

O'MALLEY, DORE and COHN, JJ., concur.

Judgment unanimously affirmed, with costs.