BETH ISRAEL HOSPITAL ASSOCIATION et al., on Behalf of Themselves and Others, Respondents, *v.* ROBERT MOSES, as Commissioner of Parks, et al., Appellants.

Argued June 9, 1937; decided July 13, 1937.

*Paul Windels, Corporation Counsel (Jeremiah M. Evarts, Paxton Blair* and *Thomas W. A. Crowe* of counsel), for appellants. The creation of a play area within Stuyvesant Square is not a violation of the conditions and covenants contained in the deed from Peter Stuyvesant. (*Stuyvesant* v. *City of New York*, 11 Paige, 414; *Fish* v. *Folley*, 6 Hill, 54; *Bendernagle* v. *Cocks*, 19 Wend. 207; *Grescot* v. *Green*, 1 Salk. 199; *Gerzebek* v. *Lord*, 33 N. J. L. 240.) A play area may be located within the borders of Stuyvesant Square. (*Williams* v. *Gallatin*, 229 N. Y. 248.)

*Thomas I. Sheridan, William H. Hayes* and *Harry C. Kane* for respondents. The deed of dedication is to be strictly construed in favor of the grantor of the lands and those who take under him. (*Williams* v. *Gallatin*,

229 N. Y. 248; *City of Hopkinsville* v. *Jarrett*, 156 Ky. 777; *Campbell* v. *Town of Hamburg*, 156 Misc. Rep. 134.) Stuyvesant Square was dedicated for use as an ornamental public square. (*Rung* v. *Shoneberger*, 2 Watts, 23; *Mahon* v. *Norton*, 175 Penn. St. 279; *Porter* v. *International Bridge Co.*, 200 N. Y. 234; *Guttery* v. *Glenn*, 201 Ill. 275.) The decree in Chancery is a binding adjudication that the city must maintain Stuyvesant Square as an ornamental public square, and that the covenant so to maintain it was not merged in the judgment at law. (*Union Nat. Bank* v. *Kupper*, 63 N. Y. 617; *Robinson* v. *N. Y., L. E. & W. Ry. Co.*, 64 Hun, 41; *Brown* v. *Fletcher*, 182 Fed. Rep. 963; *Jones* v. *Lewis*, [1919] 1 K. B. 328; *Seed* v. *Johnston*, 63 App. Div. 340; *Hughes* v. *Bingham*, 135 N. Y. 347; *Hemphill* v. *City of Boston*, 8 Cush. 195; *South Park Commrs.* v. *Ward & Co.*, 248 Ill. 299.)

FINCH, J.   The owners of four hospitals, namely, Beth Israel Hospital Association, The Salvation Army William Booth Memorial Hospital, New York Infirmary for Women and Children, and Manhattan General, Inc., all abutting on Stuyvesant Square brought this action on behalf of themselves and other persons similarly situated, to enjoin the construction of playgrounds in Stuyvesant Square. Stuyvesant Square runs from Fifteenth to Seventeenth streets in the borough of Manhattan, city of New York, and is divided by Second avenue into two small squares, each 190 feet by 450 feet.

The plaintiffs and all other owners of property abutting on Stuyvesant Square took title through mesne conveyances from the heirs of Peter Stuyvesant.

Beth Israel Hospital Association owns and maintains a hospital on the east side of Livingston place between East Sixteenth and East Seventeenth streets. This hospital contains 500 beds, with an original investment of over $6,000,000 and ministers to the sick poor of the immediate neighborhood.

The Salvation Army William Booth Memorial Hospital is on the north side of East Fifteenth street between Second and First avenues, directly opposite the southeast side of Stuyvesant Square. This is a general hospital, conducted for charity.

The New York Infirmary for Women and Children lies on East Fifteenth street and Livingston place, directly opposite the southeast side of Stuyvesant Square. This is a general hospital for women and children, containing about 160 beds, maintained by voluntary contributions.

Manhattan General, Inc., operates a private hospital at Second avenue and Seventeenth street, containing 250 beds.

Two great high schools, one with a student roll of about 4,000 boys and young men, and the other for girls and young women, are just off the square.

The defendant Park Commissioner seeks to place in each of the small squares a playground so as to attract the children from these large public schools and from this section of the city to this square.

The hospitals complain that their inmates cannot escape from the noise which will inevitably be produced by so large a number of children assembled for play, athletics and games.

The only issue before us is whether the covenants and conditions written into this grant are such as to compel the city to maintain Stuyvesant Square as an ornamental or parklike square and preclude the Commissioner of Parks from establishing playgrounds therein.

Stuyvesant Square has an origin and a history peculiar to itself. A determination in this action on the use permissible of Stuyvesant Square will have no effect on the use of other small squares and parks in the city of New York for the reason that apparently Stuyvesant Square is the only public square in the city arising from dedication by private grant. To all other parks and squares it would seem the city has taken title by purchase or condemnation.

In 1651 Governor Stuyvesant obtained title by patent to a large area on Manhattan Island which descended to his great-grandson, Petrus Stuyvesant, who died in 1805. The son of Petrus, named Peter G. Stuyvesant, inherited what is known as Peters Field Farm running from Ninth to Twentieth streets and from Fourth avenue to the East river, except four lots on Eighteenth street, which Petrus left to his daughters. In 1836 the city of New York agreed to the terms imposed by Peter G. Stuyvesant for the dedication of Stuyvesant Square. The conditions and covenants follow: " Provided always however and these presents are upon the express condition that the said lands hereby conveyed or intended so to be shall from time to time and at all times forever hereafter be appropriated to and used exclusively for the purpose of a public square to be called Stuyvesant Square AND ALSO upon the further condition that the said parties hereto of the second part or their successors shall immediately after the execution and delivery of this Indenture proceed to regulate the grounds between Fifteenth and Seventeenth streets and extending to the distance of Two hundred and twenty feet on each side of Second Avenue and enclose the lands hereby conveyed on each side of the second Avenue in the form of two parallelograms of One hundred and ninety feet by Four hundred and fifty feet six inches each with a railing similar to the one which shall be placed around Union place in the said City and plant and improve such inclosures similar to the improvements made in Washington Square in the said City of New York AND in case the said lands hereby conveyed should at any time hereafter cease to be used for the purpose of such Public Square as aforesaid then these presents and everything herein contained shall be void and thereupon the parties hereto of the first part or their heirs, SHALL and may lawfully re-enter in and upon the said premises hereby granted and every part and parcel thereof AND hold the same as of their former

estate anything herein contained to the contrary thereof in any wise notwithstanding AND the said parties hereto of the second part for themselves and their successors do hereby covenant, promise and agree to and with the said Peter G. Stuyvesant one of the parties hereto of the first part and his heirs that the said parties hereto of the second part AND their successors SHALL AND WILL stand and be seized of the hereby granted premises to the use in and by this Instrument limited and declared according to the true intent and meaning thereof AND to no other use intent or purpose whatsoever AND shall and will well and faithfully abide by observe and perform the conditions imposed upon them the said parties of the second part by the acceptance of this conveyance."

The plaintiffs in their complaint set forth their ownership and use of the lands fronting on the square, the dedication of the square by Peter G. Stuyvesant in September, 1836, the subsequent purchase by the plaintiffs of their property, the erection of their hospitals, in reliance upon the conditions and covenants in the grant, the playgrounds planned in the square by the Commissioner of Parks in violation of the conditions of the grant, and pray for a judgment enjoining the construction of the playgrounds.

The defendants in their amended answer, after denying certain allegations of the complaint, allege as a first defense that Washington Square, in September, 1836, was planted with shade trees and shrubbery as a place of outdoor recreation, and that Stuyvesant Square has been for several years deteriorating, and that the playgrounds are designed for its improvement. For a second defense, defendants allege that an action at law for damages was brought by Peter Stuyvesant in 1839 and a judgment recovered in May, 1840; through recovery of this judgment, the conditions in the deed of dedication respecting the manner in which Stuyvesant Square should be inclosed and improved were thereupon merged in this

judgment, and that when thereafter Peter G. Stuyvesant brought a suit in Chancery for specific performance of all the covenants and conditions in the deed of dedication, the Chancellor handed down a decision that the covenants concerning the manner in which the square was to be inclosed and improved were merged in the judgment at law, and that the only covenant thereafter existing was the covenant for use of Stuyvesant Square as a public square freed from all conditions.

The trial court found that the intention of Peter G. Stuyvesant in dedicating Stuyvesant Square for use as a public square, was to have the square embellished with taste and beauty and to enhance the value of his adjacent lots and that Peter G. Stuyvesant dedicated Stuyvesant Square for use as an ornamental public square. Both these findings have been unanimously affirmed by the Appellate Division and there is evidence to support both.

The evidence showed that in September, 1836, the city took possession of the lands as dedicated, and that in January, 1838, the Mayor approved resolutions of the Common Council directing the Street Commissioner to advertise for estimates for regu ating and inclosing Stuyvesant Square in conformity with the conditions of acceptance, and appropriated $56,000 for that purpose. Nothing further was done by the city, and in March, 1839, Peter G. Stuyvesant brought an action at law against the city for breach of the covenants in the deed, alleging in the complaint that he was the owner of certain lots fronting on Stuyvesant Square and of other lots on the streets adjacent, which he held for sale and leasing, and that his yearly damage caused by the failure of he city to regulate, inclose, plan and improve Stuyvesant Square in the manner agreed upon, was in excess of $49,000, and he asked judgment for $150,000 damages for the three years' breach. The city entered a general denial, pleaded the resolution of 1838 and performance thereunder with reasonable diligence. The action was

tried in April, 1840. On the trial the city contended that the only damages Stuyvesant could recover were " such loss of income as could be shown from the time when the defendants should be found to be in fault until the time of the commencement of the said action, and the Judge at their instance and with the assent of your Orator's counsel so charged the jury." A verdict for damages " for little over one year " was rendered in favor of Peter Stuyvesant in the sum of $3,056.25. The judgment entered on this verdict was paid by the city.

After the recovery of this judgment Peter Stuyvesant frequently urged the city to perform the covenants contained in the deed of dedication. The city did not comply. In April, 1841, the Board of Assistant Aldermen adopted a resolution that a wooden railing be put around the square. In December, 1841, Stuyvesant filed a complaint in Chancery, asking for specific performance of the covenants in the deed. The city filed a general demurrer. The cause was referred to the assistant vice-chancellor who overruled the demurrer and found that Stuyvesant was entitled to specific performance of all the covenants contained in the deed. The city appealed to the Chancellor, who in January, 1845, handed down his opinion holding that the recovery of damages for breach of the covenants to fence and improve in a particular manner bars a bill for specific performance of these covenants; but that the covenant to maintain the premises as a public square was a continuing covenant and a recovery for breach of that covenant did not bar a suit for specific performance.

In April, 1845, an order was entered by the Chancellor affirming the decree of the assistant vice-chancellor who had overruled the demurrer. The demurrer was to the whole bill and hence the Chancellor affirmed the assistant vice-chancellor because the Chancellor found the bill good as to that part of the bill which held that the covenant to maintain the park as a public square was still valid.

After the demurrer was overruled, the city filed no answer to the bill of complaint and in May, 1845, on default of the city an order was entered that the bill of complaint be taken *pro confesso* against the city. Following this, in August, 1845, a decree was entered in which it was ordered, adjudged and decreed " That the defendants be perpetually enjoined and restrained from using the lands and premises in the Bill of Complaint described as forming Stuyvesant Square, or suffering or permitting the same to be used for any other purpose than that of a Public Square *for the purposes in the Bill of Complaint described, and in the deed of covenant and grant therein contained set forth.* And that the defendants be also enjoined from suffering or permitting to remain or continue on the said premises all or any persons who have intruded themselves upon the said premises and all and singular buildings and erections thereon which are inconsistent with the purposes for which the premises were granted as aforesaid. And that the defendants forthwith cause the said persons buildings and erections to be removed therefrom." (Italics interpolated.)

The decree further referred the matter to a master in chancery to compute the damages sustained by Stuyvesant since the commencement of the suit at law down to the time of the decree in equity by reason of the breach of the covenant. The Chancellor having stated in his opinion that the complainant was not entitled to all the relief specifically prayed in the bill of complaint, Stuyvesant, in October, 1845, took an appeal to the Court for the Correction of Errors, which is now the Court of Appeals. This appeal was from that part of the decree which denied Stuyvesant specific performance of the covenants to " regulate the grounds," to erect an iron railing of a certain type and plant and improve Stuyvesant Square in the same manner as Washington Square in September, 1836. The city did not appeal.

In January, 1846, the owners of property around Stuyvesant Square presented a memorial to the Common

Council of the city, stating that they had invested their money in full confidence that the city would comply in good faith with the covenants in the grant, and petitioned the Common Council that Stuyvesant Square might be improved in the style contemplated forthwith, and as agreed upon in the original deed of cession. In answer to the petition the Common Council appropriated $20,000 to inclose Stuyvesant Square with a neat, elegant and strong railing, and in February and April, 1848, the Common Council directed that Stuyvesant Square be graded and planted with grass and clover and trees and shrubbery. In October, 1848, the Corporation Counsel made a report to the Board of Aldermen concerning the suit in Chancery brought by Peter Stuyvesant which was then on appeal. The Corporation Counsel stated that the executors of Peter Stuyvesant were willing to withdraw the appeal provided the city would widen the sidewalks on Second avenue from Eleventh to Twenty-second streets and permit the property owners to inclose yards in front of their houses, reset the fence of the square on Second avenue so as to take in part of the sidewalk, repay the counsel fees which Peter Stuyvesant had paid in the suit for specific performance, and place a fountain in each of the two squares. The report of the finance committee to the Common Council stated among other things that "on a careful examination of the whole subject, thus committed to them, and having advised with the Corporation Counsel thereupon, your Committee are of the opinion that it will be best to avoid the chances of a legal decision by making an amicable settlement of the controversy." The Common Council thereupon passed resolutions providing that upon the discontinuance of the suit against the city, and a release of all claims for damage, the city would pay the costs of the suit, repay the counsel fees paid by Stuyvesant, and place a fountain in each of the inclosures. Pursuant to this the appeal in suit was dismissed.

Stuyvesant Square having been inclosed with this ornamental iron fence, beautified and embellished with lawns, shrubbery, trees, winding walks and fountains, was kept as an ornamental public square, in which the gates were locked each night and opened in the morning, for almost one hundred years. Recently the custom of locking the gates each night has been abandoned, and the fences protecting the lawns have recently been removed. Supervision of the square has become lax, and the physical condition of the square has become bad.

The Commissioner of Parks now proposes to remove the lawns in the southerly half of each portion of the square, put concrete where such lawns are, and erect shuffleboard courts, parallel bars, playhouses, ping pong tables, swings, horizontal ladders, wading pools, showers and other gymnastic and playground apparatus. This constitutes a direct invitation to attract thousands of children to play boisterously beneath the windows of these hospitals. It is stated that the amount adapted to these playgrounds will be one-twelfth of each of the parks. It is contended, however, by the hospitals that as each playground is to be in the center of the southerly half of each part, and as the space outside the fence will be merely a border around the playground, a substantial part of the southerly half of each square will be used as a playground and in effect the whole southerly half of each square will be practically devoted to such purpose.

The terms of the grant, coupled with the findings of the trial court, unanimously affirmed by the Appellate Division, show that it was a condition of the grant and the intention of the grantor that these squares should be maintained as ornamental or park-like squares. The appellants do not seriously controvert these terms of these findings, but seek to dispose of these covenants and conditions by reason of the findings of the Chancellor that the suit at law by Stuyvesant upon the covenant

extinguished the covenant. In other words, the fact that Stuyvesant attempted to recover at law his damages for the breach of this covenant up to the time of trial in effect changed this covenant from one for the life of the grant to a covenant for a space of approximately three years, or up to the time of the suit at law. The principle involved was that this suit extinguished the covenant by merging it in the judgment at law. Whether or not this covenant was a continuing covenant, and whether in equity as distinguished from law, specific performance would lie thereon, presents a real controversy.

It is to be noted that the previous litigation arose only upon a general demurrer to the whole bill of complaint in equity and the decision was given as a matter of law upon the plea in the answer of the city based upon the records of the court showing that Stuyvesant had theretofore brought a suit at law for damages based upon a breach of the conditions in the deed of dedication respecting the manner in which Stuyvesant Square should be inclosed and improved and in that suit had recovered damages. The Chancellor thereupon held that the covenants concerning the manner in which the square should be inclosed and improved were merged in the judgment at law and the only covenant thereafter existing was the covenant for use of the square as a public square freed from all other conditions. While holding the above, however, as the ground for his decision, the chancellor as already noted affirmed the decree appealed from which overruled the demurrer and sent the case back for trial. This because the demurrer was to the whole bill and the Chancellor held that part good relating to the covenant for a public square.

When the case went back to trial the city defaulted and hence a decree was entered in accordance with the allegations of the complaint which decreed all the conditions originally existing.

From the above certain important conclusions follow: *First*, this court is not bound by what took place in that

litigation. *Second*, the trial court in the case at bar was not bound in so far as its findings of fact are concerned, and the trial court has found, which finding has been unanimously affirmed by the Appellate Divison, that in September, 1836, when the deed of dedication was made, Washington Square was " an ornamental public square * * * and did not contain a playground or anything equivalent to a modern playground * * * [and that] Peter G. Stuyvesant dedicated Stuyvesant Square for use as an ornamental public square."

There is really not much dispute, and cannot be, that Stuyvesant dedicated this square upon a covenant and condition as to the manner of its use, namely, as an ornamental public square for the following reasons:

*First*, he specifically provided in the deed that it should be planted and improved similar to Washington Square and we have the above finding that Washington Square was then an ornamental public square. *Second*, the Chancellor in his decision inferentially admits the above covenant and condition and seeks to do away with it by reason of the doctrine of merger as above stated. *Third*, the foregoing is the position of the city upon this appeal. *Fourth*, the decree of the Chancellor as entered is certainly entitled to more weight than his opinion and that restored the covenants as they originally existed.

Furthermore whether a merger took place depends upon whether the condition and covenant to regulate the grounds and keep them as Washington Square was then kept, was intended to be a continuing condition and covenant or not. The trial court has by its findings held that this was the intention of the grantor. Even if the trial court should be bound by the decision of the Chancellor rather than the formal decree, still this court is not bound and the deed of dedication on this subject is at best ambiguous. A deed of dedication which is ambiguous must be construed in favor of the grantor and those who take under him. (*Bradley* v. *Crane*, 201

N. Y. 14; *Williams* v. *Gallatin*, 229 N. Y. 248, 253; *City of Hopkinsville* v. *Jarrett*, 156 Ky. 777.)

The decree in Chancery moreover was a binding adjudication that the city must maintain Stuyvesant Square as an ornamental square. How are we able to say that the Chancellor after hearing Hamilton Fish of counsel for Stuyvesant before entering the decree did not change his mind from the time he wrote the opinion. Certainly the Chancellor entered the decree at a later time and after hearing counsel for Stuyvesant. In any event the decree as entered supersedes the earlier opinion (*Union Nat. Bank* v. *Kupper*, 63 N. Y. 617; 2 Freeman on the Law of Judgments [5th ed.], § 772), and this is not changed because, perhaps out of abundant caution, Stuyvesant took an appeal to the Court of Errors and Appeals.

The judgment should be affirmed, with costs.

CRANE, Ch. J., HUBBS, LOUGHRAN and RIPPEY, JJ., concur; LEHMAN and O'BRIEN, JJ., taking no part.

Judgment affirmed.