139 So.2d 592

**F. M. REID et al.**

v.

**CITY OF BESSEMER et al.**

**6 Div. 736.**

Supreme Court of Alabama.

March 29, 1962.

Lipscomb & Lipscomb and L. Herbert Etheridge, Bessemer, for appellants.

McEniry, McEniry & McEniry, Bessemer, for appellees.

GOODWYN, Justice.

This is an appeal by the complainants (five citizens and taxpayers of the City of Bessemer) from a decree of the circuit court of Jefferson County, in equity, Bessemer Division, denying an injunction against respondents (Commissioners of the City of Bessemer, Members of the Bessemer Park and Recreation Board, and Members of the Bessemer Board of Education) to restrain them from using Block 244, according to the Bessemer Land and Improvement Company's survey of the City

of Bessemer, for public school purposes. The basis for such relief is complainants' contention that Block 244 has been dedicated as a public park and that the building of a school thereon would be contrary to the use for which it was dedicated.

The position taken by respondents is that the dedication was for public purposes generally; that there was no conveyance of dedication limiting the use of the block strictly for park purposes and, therefore, the City of Bessemer may utilize the block for any public purpose (which includes a school) as it may determine to be in the best interests of the citizens of the city.

There is no disagreement between the parties that there has been a common-law dedication of the block. The controverted issues are as follows: First, whether the dedication of the block was for use as a park, as contended by appellants, and not for general public uses, as appellees contend, and, second, if dedicated for use as a park, whether the building of a school on the block would be inconsistent with such use. Our conclusion is that the block was dedicated for use as a park and that the building of a school on it would be a diversion to a purpose inconsistent with that of its dedication

In January, 1887, the Bessemer Land and Improvement Company was incorporated in Jefferson County for the general purpose of acquiring land for building a city or town to be called "Bessemer." On April 11, 1887, the company filed in the office of the Judge of Probate of said County a plat of the City of Bessemer. Included in the plat was Block 244, divided into 40 lots, and bounded by Second and Third Avenues and 16th and 17th Streets. The other blocks were also subdivided into lots, with the blocks immediately surrounding Block 244 being subdivided in the same manner as said block. Henry F. DeBardeleben signed and acknowledged the plat as the company's president. On November 1, 1888, an amended plat was recorded, but Block 244 and the blocks immediately sur-

rounding it remained unchanged. The amendment was executed on behalf of the company by William Berney, its vice president, and H. M. McNutt, its secretary. The company proceeded to sell lots in the plat, but none of the lots in Block 244 has ever been sold.

From the company's minutes of November 1, 1888, is the following:

"The president reported that the city had asked that a certain block belonging to this company and known as Berney Park be given into the city's charge and keeping for three years. On motion of Mr. Lopez it was agreed to lease said block, being number 244, to the City for a term of three years for the sum of $1.00 per annum on condition that it be kept in good condition and used for no other purpose than at present without consent of this Board."

At least since 1897, Block 244 has been assessed to the City of Bessemer as a park (the tax records prior to that time could not be found). It was known as "Berney Park" until April 1907, when it was changed to "DeBardeleben Park." Since that time it has been known as "DeBardeleben Park."

Some time prior to 1917, the exact time not appearing from the evidence, Bessemer Coal, Iron & Land Company became the successor of Bessemer Land and Improvement Company, and continued to sell lots in the plat of the City of Bessemer. In connection with such sales, a map was used showing Block 244 as an open area with walkways running diagonally across it and with a circular area marked off where the walkways crossed. The map contains notations of sales of lots as early as 1900. (Some of the notations are not clear, and whether earlier sales were made based on said map is not established by the evidence). A number of other sales are shown from that date through 1907. There are also later sales. Another map introduced in evidence was a "Map and Survey

under authority of Bessemer Coal-Iron and Land Company, H. L. Badham, Pres't, Jas. Bowron, Vice-Pres't, W. A. Reed, Sec'y-Treas," which shows Block 244 the same as the other map except for being marked "City Park." The date of this map and survey is not disclosed. One witness testified that he knew the walkways had been there for about sixty years. Another testified that when he moved to Bessemer in 1918 the block "was practically like it is right now. They added the bandstand there; had a fence around it, an iron fence, with a hedge growing in it all the way around the park, and it had four gates, one in each corner of the park." There is no fence or hedge around it now. These have been down a good while. The block is generally level with trees growing almost all over.

The evidence discloses that the area has been used by "a lot of little kids" with their nurses, the Boy Scouts, and a "lot of old retired men used to go down there and sit four, five hours at a time" on benches, and at times it has been used for such activities as public gatherings and speakings, barbecues, amateur nights, movies, Easter egg hunts, Fourth of July celebrations and band and orchestra concerts. After World War I there was erected on it a "Doughboy" monument where there had been a goldfish pond. Also, a wading pool and tennis court were on it at one time.

■ We are unable to agree with appellees' contention that the uses made of the park, as above set forth, disclose an intention that the park was dedicated for all public purposes, including a school building. It seems to us that the enumerated uses lend support to, rather than cast doubt upon, the conclusion that the area was dedicated as a park. (Under the circumstances, there is no necessity of determining when the dedication became effective.) In 39 Am.Jur., Parks, Squares and Playgrounds, § 2, p. 803, a park is defined as follows:

"In times past, a park was understood to be an open square or plaza, usually containing shade trees and seats. No doubt the idea of open air and space with the land kept in grass and trees, as if approximately in the state of nature, still inheres in the general understanding of the word, but it is no longer the dominating thought as it formerly was. The trimming away of thickets and underbrush, the substitution of regular pathways paved and perhaps railed and artificially lighted, which would have been incongruous to our forefathers, now enter into the accepted idea of a park. The term 'park,' as now commonly understood in this country, means a piece of ground acquired by a city, town, or other public authority, for ornament, and as a place for the resort of the public for recreation and amusement. It is usually laid out in walks, drives, and recreation grounds, so as to afford pleasure to the eye as well as opportunity for open-air recreation. * * *"

From 67 C.J.S., Parks, pp. 861–863, is the following:

"The question of the use to which parks may be devoted has arisen in many jurisdictions, and there is general agreement that a park is a place for the resort of the public for various purposes, such as for the purpose of recreation, such as for the purpose of exercise, and health, enjoyment, amusement, and, likewise, such as for the purpose of rest and pleasure.

"Parks are also maintained for purposes of ornamentation, and, while it is customary to lay a park out in walks, drives, and recreation grounds, so as to afford pleasure to the eye as well as opportunity for open-air recreation, a park does not have to be laid off in paths or planted with flowers. * *"

In Black's Law Dictionary, Fourth Ed., pp. 1271–1272, are the following definitions of a park, viz.:

"An inclosed pleasure-ground in or near a city, set apart for the recreation

of the public. * * * A pleasure ground for the recreation of the public to promote its health and enjoyment. * * *

"A piece of ground enclosed for purposes of pleasure, exercise, amusement, or ornament. * * * A place for the resort of the public for recreation, air, and light; a place open for everyone. * * *

"A detached tract of ground set apart and maintained for public use, generally of quite sizable proportions devoted to purposes of ornamentation and recreation, usually platted out with trees and ornamented in a way pleasing to the eye as well as furnishing an opportunity for open-air recreation. * * *

"As applied to pleasure grounds and spaces or open places for public use or public recreation owned by towns, the term is largely one of quite modern usage, and until recent years such places were in popular speech spoken of as 'squares' and 'commons.' * *"

■ We come now to the question whether the building of a school on land dedicated as a park would be a use inconsistent with the purpose of its dedication. As to this, the rule is thus stated in 39 Am. Jur., Parks, Squares, and Playgrounds, § 31, p. 827, viz.:

"The use of public park lands for the purposes of a school is generally held a diversion in violation of the dedication or uses permissible by law. * * *"

The question is quite adequately dealt with in Headley v. City of Northfield, 227 Minn. 458, 35 N.W.2d 606, 610, where it is said:

"The defendant city, being a trustee for the benefit of the public of the public square, will be treated as one by holding it to the duties and the accountability of a trustee. Its duty is to devote the public square to the uses intended by the dedicator. Its accountability is for the discharge of that duty. Any use thereof by the city inconsistent with the uses intended by the dedicator constitutes a breach of trust and a violation of the statute imposing the trust in such cases. Annotations, 144 A.L.R. 488, 63 A.L.R. 485, and 18 A.L.R. 1247; 39 Am.Jur., Parks, Squares, and Playgrounds, § 21. The rule in this respect differs from what it is in cases where the public authority acquired title to the fee, or acquired rights by exercise of the power of eminent domain, or was otherwise free from any trust. Spires v. City of Los Angeles, 150 Cal. 64, 87 P. 1026, 11 Ann.Cas. 465; Higginson v. [Treasurer & School House Commissioners of Boston] Slattery, 212 Mass. 583, 99 N.E. 523, 42 L.R.A.,N.S., 215; 39 Am. Jur., Parks, Squares, and Playgrounds, §§ 12, 21.

"Use of the public square for a high school athletic field and playground would be a public use, but one not only different in kind from use as a public square, but positively inconsistent therewith and destructive thereof and consequently unlawful. The authorities hold that it is a diversion from the uses intended by the dedicator, and consequently illegal, to use a public square for purposes either of a school (McCullough v. Board of Education, 51 Cal. 418; Melin v. Community Consolidated School District, 312 Ill. 376, 144 N.E. 13; Rowzee v. Pierce, 75 Miss. 846, 23 So. 307, 40 L.R.A. 402, 65 Am.St. Rep. 625, supra), or of a playground (Beth Israel Hospital Ass'n v. Moses, 275 N.Y. 209, 9 N.E.2d 838, affirming 250 App.Div. 591, 294 N.Y.S. 1018; McVean v. City of Elkins, 127 W.Va. 225, 32 S.E.2d 233). Use for high school athletic field and playground purposes here contemplates that the public square shall no longer remain free and common for use by all the

public, but that it shall be occupied to the exclusion of the general public by grounds specially constructed and equipped for particular athletic and physical activities and by persons engaged thereon in them. The contemplated uses would not only render unfeasible well-recognized and customary uses of a public square such as the one made by elderly people of the benches, of that which gives children a place to romp and mothers a place to wheel their baby buggies, and others which will occur to anyone familiar with the uses of a public square, but would absolutely prevent them. * * *"

See, also, Board of Mayor and Aldermen of Yazoo City v. Wilson, 232 Miss. 435, 99 So.2d 674; Anderson v. Mayor and Council of Wilmington, (Del.Ch.) 137 A.2d 521; Anno: 18 A.L.R. 1256, 63 A.L.R. 488, 144 A.L.R. 486.

Reversed and remanded.

LIVINGSTON, C. J., and SIMPSON and COLEMAN, JJ., concur.