John P. Cohalan, Jr., J.
This is a proceeding under article 15 of the Real Property Actions and Proceedings Law. At issue is the location and ownership of 11 Aaron’s Landing ”, a 90-rod strip of land running along the west side of the Nissequogue River in the Town of Smithtown, including land between high- and low-water marks.
In the composite of its complaint, of oral argument at trial, and of briefs submitted to the court, the town traces its claim back to the year 1735 (complaint) and beyond that to Richard (Bull) Smith, (1665 and 1677) colonial patentee; and, in effect, contends that the real property now encompassing the town was given to Smith in a representative or quasi-governmental capacity, only.
Defendants urge that (1) Smith took as an individual and/or (2) that Aaron’s Landing was set aside for a definite, dedicated use, which, upon abandonment, effected a reversion to the heirs and assigns of Smith. Factually, since the disputed terrain was not used for any public purpose from about the year 1870 to the present, they urge also, the defenses of adverse possession and estoppel — the latter because the town allegedly recognized their ownership by assessing the various parcels and by levying and collecting taxes therefrom.
Three hundred years of history and legend have obscured the original scene; and many a tide has ebbed and flowed over thatch *710 beds, marsh and meadow; and many documents and records have been submitted to the court to establish its pristine status, which we now seek to resolve.
In the year 1664 Charles II, y-clept “ The Merry Monarch ”, sat on the throne of England. Repute has it that “ he never said a foolish thing, nor ever did a wise one ’ ’. But, in that year with royal largesse, he gave away, by right of conquest, vast portions of land along the Atlantic seaboard to his younger brother, James, then Duke of York, as a crown colony. In the latter end, it turned out to be a wise ‘ ‘ thing ’ ’ indeed.
James, in turn, deputized Richard Nicolls as his ancient with plenary powers to govern part of the given land in his stead. Our specific concern is with the East Riding of Yorkshire, which today we know as Suffolk County in the State of New York.
On March 3, 1665 Gfovernor Nicolls granted unto Smith a patent encompassing all of the present Town of Smithtown. As to that part of the town on the east side of the Nissequogue, the grant was undisputed; but it necessitated a confirmatory grant in 1677 from Edmund Andros, successor to Nicolls, to vest Smith with undisputed title to the land west of the river, after legal jousts in the Dutch and English colonial courts had served effectively to oust the Town of Huntington from its claimed ownership.
A prerequisite to the enjoyment of the Nicolls grant ordained that Smith settle 20 families upon the land. It went on to note the existence of the litigation with Huntington, as a result of which Smith “ is molested and hindered in the quiet possession thereof ” and thus need settle only “ ten families on the lands before mentioned within three years after the date hereof ’ ’.
Immediately following appears the caveat: ‘ ‘ But if it shall hereafter happen that the said Richard Smith shall cleere his title and be lawfully possessed of the premises as aforesaid that then he the said Richard Smith shall settle the full number of twenty families within five years after such clearing of his title ”.
Forasmuch as the Andros patent is silent on the plantation condition, it was presumably adhered to. Thus the original patent was confirmed 11 unto ye said Richard Smith, his heirs and assignes ’ ’:
“ ye afore recited tracts or parcells of land on both sides of the Nesaquake River, together with all ye lands, soyles, woods, meadows, pastures, marshes, lakes, waters, fishing, hawking, hunting and fowling, and all other profits, commodities and emoluments to the said parcels of land and premises belonging ’
‘‘ To have and to hold, the sayd parcels or tracts of land and premises, with all and singular the appurtenances, unto the said *711 Richard Smith, his heires and assignes, to the proper nse and behoof of him the said Richard Smith, his heires and assignes forever. The tenure of the said lands and premises to be according to the custom of the manor of East Greenwich, in the County of Kent in England in free and common socage and by fealty only. As also that the said place be established as a township and be called and known by the name of Smithfield or Smithstowne, by which name to be distinguished in all bargaines and sales, deeds, records and writeings ’ ’.
East Greenwich was a royal manor mentioned in grants or patents as descriptive of the tenure of free socage.
As quit rent and acknowledgment, Smith was to pay “ one good fatt lamb ’ ’ per year.
In 1691 the colonial Legislature again confirmed the patents, first as against their majesties of England and then “ unto all and every the several and respective corporations or Bodies Politick, of the Cities, Towns and Manors and their successors, and also unto all and every the respective freeholders, their heirs and assigns forever within the premises ’ ’. Of this clause, Judge Denio in People v. Van Rensselaer (9 N. Y. 291, 347) said: “ The intent to embrace grants in fee to individuals seems to me to be nearly as strong as language could make it. There are extant, grants to the freeholders of towns, as a sort of corporation (2 Wend. 110), but these could not have been intended, for it is to the several and respective freeholders, within the province ; and then it is not to their successors as in these quasi corporate grants, but to their heirs and assigns for ever; and this language could not be applied to any subject with which I am acquainted, except the grants of land to an individual ”.
Smith sired numerous progeny, eight of whom survived him (including two daughters, Deborah and Elizabeth), some of whom were among the 20 families required to be settled within the limits of the territorial grant.
In his lifetime he made many and varied gifts and grants of land to his children and to strangers, treating it for all purposes as his to give or grant.
And well he might, relying on his ‘ ‘ free and common socage ”. For, in 1660 when the restoration re-enthroned the Stuarts, the supporters of Charles II, fearing the possible arrogation of power once assumed by his decapitated father, exacted from him the legislation of 1660, to which he proved most amenable. “ By this statute land theretofore held in military tenure or by socage tenure in capite was changed to free and common socage. Future land grants were to be made exclusively in common socage ”. (See 1 Powell, Real Property, § 32.)
*712 According to Buckle (History of Civilization in England), this legislation marked the end of the feudal era, a way of life which, happily, never crossed the sea to the American Colonies.
Socage was a species of tenure, in England, whereby the tenant held certain lands in consideration of certain inferior services of husbandry to be performed by him to the lord of the fee. Black’s Law Dictionary (4th ed.) page 1561, tells us that: “ Socage is of two sorts,— free socage, where the services are not only certain, but honorable; and villein socage, where the services, though certain, are of baser nature ’ ’.
That socage referred to in the Andros patent was known as gavelkind (free socage), which, as the same dictionary records (p. 811), is: “ A species of socage tenure common in Kent, England, where the lands descend to all the sons, or heirs of the nearest degree, together; may be disposed of by will; do not escheat for felony; may be aliened by the heir at fifteen; and dower and curtesy is given of half of the land. ’ ’
■So, in reliance on this socage, when the founder passed to his reward in the year 1692, his will, made jointly with Sarah, his wife, and dated in the same year, provided, inter alia: “ Item. To Jonathan Smith, our eldest son, we give and bequeath * * * and that lot of meadow over against the hill on ye west side of ye river.”
It is this devise, out of which, as defendants claim, Aaron’s Landing was carved. Plaintiff asserts to the contrary.
And to each of the eight children, saving only Elizabeth (Townley) to whom a specific devise was made, he and .Sarah gave “ an equal share of land in division with the rest of our children.”
Sarah survived her husband for about 15 years, and during viduity, did nothing to disturb the status quo with respect to the property at bar.
In due course Jonathan also passed on; and what he had, descended in turn to his son, Jonathan (II). The latter, for his part, in the year 1734 conveyed to his son, Platt: “ All my right, title and claim, to all that tract of land lying between Huntington East line and Smithtown River. Also all claim to that one seventh part of thatch bed which I bought of Obadiah, Richard, Job and Daniel Smith. .And all claim to the meadow on the west side of the river. Likewise all my right and claim to the river ”.
By Smithtown River was meant the Nissequogue.
Several years later, in his will, Jonathan II excoriated Platt, his son, for having misled him at the time of the conveyance, saying he had given it to him for temporary use only. However, no *713 reservation appeared in the deed itself, which spoke of “my beloved son, Platt The land covered by this deed, say the defendants, is part of the same that Jonathan I received from Richard, paterfamilias, and included Aaron’s Landing which, apparently, was already in existence and in use. And it is through this chain of title on which defendants base their claim.
Aaron’s Landing, itself, was used for loading and unloading small draught cargo vessels which plied the meandering Nissequogue. Nearby was a ford or “ going-over ” for horses and horse-drawn vehicles to cross the river in two directions, east and west.
Not until March 13, 1735, after Richard and Sarah and all their children had expired, or had disposed of their holdings, was anything done to distribute the undivided lands. Only then did the grandchildren foregather as the 11 inhabitances, freeholders and commoners of the land in Smithtown * * " to lay out & judge of & equalize all the freeholders and commoners in ye undivided lands and thatchbeds according to their just rights therein ”,
By their article or agreement, the “ proprietors ”, as they were referred to in places other than the ageement itself, named certain men to do the laying out and dividing.
These men and their successors (commissioners) appointed in 1735 did not complete their labors until the year 1761. And now we approach the crux of the litigation.
Prefatory to the final distribution of August 4, 1761, the three Commissioners noted that:
“ There are several other pieces of thatch and meadow yet remaining that will be laid out to particular persons, and they will then be described and bounded in the same survey and return.
‘ ‘ Having thus gone through the general description of the survey and boundaries of the thatch beds and meadows with the manner of the several divisions therof, we shall now proceed to the particular division and allotment of them among the proprietors of the same ’ ’.
They then proceeded to an allotment of the remaining parcels, consisting of 14 numbered items.
In Ninthly ‘ ‘ we lay out to Elizabeth Smith, daughter of Platt Smith, deceased * * * (excepting the place left for a common landing and watering place beginning at the road, by the point, and running thence northward) * * * And though we mention them as all laid out to Elizabeth, yet we lay them out and adjudge them as being the whole share, right and proportion *714 of meadow and creek thatch that is due to her and her sister, Abigail Smith ”.
“ 13th. By agreement of the proprietors there is place reserved for a publick landing and watering place on the east side of the river against Blydenburgh Island. Beginning * * * and so we leave it.”
‘ ‘ 14th. By agreement of the proprietors there is another place left for a publick landing and watering place on the west side of the river, Beginning at the road by the point of the upland, on the farm late Platt Smith’s deceased, and running thence northward along the shore by the bank of the upland and low water mark ninety roads. And here note that the highway and passage over the river is not meant to be laid out by us as the private property of any one, nor in any manner obstructed by any of the preceding divisions on the returns made thereon.”
Aaron’s Landing is the “ publick land and watering place ” referred to in “ 14th ’ ’. To plaintiff ‘ ‘ left ’ ’ means given or granted; to the court it means merely “ set aside ”.
At this point the defendants raise an objection that by virtue of the deed from Jonathan II to Platt Smith, the action of the commissioners in setting aside the subject property for a “ publick landing” was beyond their power to perform.
They note, also, that even though mention is made in “Ninthly” of Elizabeth and Abigail (Platt Smith’s other daughter) there is no indication that Abigail ever joined in any agreement; and that she would, at least, share as a tenant in common with her sister in the land described in ‘ ‘ Fourteenthly ’ ’.
The greater portion of the trial before the court (without a jury) concerned itself with the physical location of “ Aaron’s Landing”. By a process of elimination involving the use of numerous maps prepared for the occasion and of many documents, ancient and modern, the Town Engineer as a result of exhaustive research — demonstrated to the court’s satisfaction the situs of Aaron’s Landing. Factually, then, the court finds that it is, or was, where the town claims it to be, or to have been.
Having established the physical whereabouts of the Landing, the remains of the dock and the location of the ‘ ‘ going over ’ ’, plaintiff town then advanced the claim that by virtue of the 1735 agreement, it is entitled to full ownership of the disputed area. The ratiocination is that the “ proprietors ” in 1735 were the alter ego of the town, as allegedly decreed by Governor Andros in the patent of 1677; and that in having “ left ” the area for a “ publick landing ” in 1761, they were acting in their capacity as town officials.
*715 By way of illustration the town points to other patents on Long Island, such as Southampton, Easthampton, Southold, Oyster Bay and Brookhaven.
As to Southampton, the grant ran to 12 patentees, described as: “ freeholders and inhabitants of Southampton hereinafter erected and made a body corporate, to be called by the name of the freeholders and commonalty of the Town of Southampton ’ ’. Later in the same grant the patentees are declared to be the first trustees of the town to continue in the aforesaid office from and after the date of these presents until the time that others be elected. (See Trustees etc. of Town of Southampton v. Mecox Bay Oyster Co., 116 N. Y. 1 [1889].)
In Trustees etc. of Town of Easthampton v. Kirk (68 N. Y. 459, 462) it was' noted that the Dongan patent in 1686 ran to: ‘1 trustees of the freeholders and commonalty of the town of East-Hampton ” and that the grant was in trust and for the use of the inhabitants of the town.
In an ejectment action (Town of Southold v. Parks, 41 Misc. 456) in 1903, the trial court (Sup. Ct., Suffolk County) noted that the Andros patent of 1676 had run to the town rather than to any one or more individuals.
The patent to Oyster Bay, dated in 1677, ran from Governor Andros to Henry Townsend, Sr. and six other persons named therein (Tiffany v. Toion of Oyster Bay, 209 N. Y. 1, 5): “ as patentees for and on behalf of themselves and their associates, the freeholders and inhabitants of the town ”, which is characterized at the beginning of the patent as a “ certaine Towne in the North Riding of Yorkshire upon Long Island, commonly called and knowne by the name of Oyster Bay ”.
To complete the five towns, we have Trustees of Brookhaven v. Strong (60 N. Y. 56, 57 [1875]) where, in an action for damages, reference is made to the Nicoll patent of 1666 — and incidentally to Richard Smith — which gave to “ Richard Woodhull and others, as patentees, for themselves and their associates, the freeholders and inhabitants of Brookhaven, all the tract of land which had been, or should thereafter be purchased for said town from native Indian proprietors or others, within the following bounds: 1 The west boundary to begin at the line run by the inhabitants of said town between them and Mr. Smith’s land of Nessequake [Nisseqitogue], as in his patent is set forth ’ ” (italics and parentheses supplied).
Governor Dongan gave a confirmatory patent ‘ to trustees ’ in 1686.
In effect the town now asks ‘ ‘ why would a royal governor convey what is tantamount to fee title to Richard Smith as an *716 individual when all the others noted took their grants in a representative capacity? ” The implication is that Smithtown would thus be unique if such were the case. That, however, is not so. For in 1693 Benjamin Fletcher, then Captain-General and Governor-in-chief of the Province of Few York, granted land for his service to the Crown to William “ Tangier ” Smith ‘ ‘ and his heirs ’ ’ and proceeded to give him certain tracts of land in Brookhaven known as the lordship and manor of St. George, ‘ ‘ together with the waters, rivers, lakes, creeks, harbors, bays, islands, fishing, fowling, etc. * * * and all rights * * * privileges * * * and appurtenances whatsoever to the aforesaid necks and tracts of land, bay, beach and islands within said bay ”. See Trustees of Town of Brookhaven v. Smith (118 N. Y. 634 [1890]) — an ejectment action.
Also, as noted in Trustees of Brookhaven v. Strong, (60 N. Y. 56, 58-59, supra) Governor Dongan in 1684 had: “by letters patent * * * granted to William Nicoll a certain tract of land on the south side of Long Island extending west from the river Conetgnot to a stream called the Cantatquetate, and being bounded by the bay. These premises so granted to William Nicoll were within the original bounds of the Brookhaven patent, and were subsequently made a part of the town of Islip, and form the easterly part of that town ’ ’.
To demonstrate further the lack of uniqueness as to the grant to Richard Smith, we know that the first Lion Gardiner was given outright (and his descendants own it to this day) the beautiful Gardiner’s Island off the east end of Suffolk County.
There may, too, be some significance in the wording in the Andros Patent which directed the use of the name “ Smith-field ” or “ Smith’s Towne ”, the only occasion in either the East or North Riding when a town was named for a family;
We have already noted that the Nicoll patent to Richard Smith in 1665 made no mention of the latter in any representative capacity. Rather it took cognizance of the travail in clearing title to the land; and referred to an instrument whereby Lion Gardiner “ sold and conveyed ” unto “ Richard Smith and his heires ” the property now in question.
So, even if we assume that the town was created as to its physical boundaries, it does not necessarily follow that the 1735 signers were the agents of the town. For, with two exceptions, they were all named Smith; and with one exception all were grandsons of Richard the First. Daniel Lawrence was a son of Deborah (daughter of Richard). She lived until 1743 but had apparently conveyed her interest in the family property to her son.
*717 Zepheniah Platt was a nephew by marriage of Jonathan II, who in turn was a grandson of the founder. Of the others, Daniel II was the son of Daniel I; Edmund the son of Adam; Ebenezer and Richard III of Richard II (Junior); “'Saint” Richard, Joseph, Timothy, Aaron and Job II the offspring of Job I; Obadiah the scion of Samuel; and Jonathan I begat Jonathan II.
Aside and apart from their contention that Platt Smith’s family already owned the landing property, defendants urge the view that the signers were dealing with undivided land and thus with their own property as their own property. They point to the circumstance that families not related to the Smiths then resided within town limits, but were not parties to the agreement. In sooth, three such names appear as witnesses on the instrument, to wit: Schubal Marchant, Christopher Crosgrove and Nathan Curwen. They invite attention, too, to the make-up of the town and point to the various town officials who were not privy to the agreement.
From this premise defendants say, even assuming arguendo that the Commissioners could establish the “ publick landing ”, the factual circumstances of the setting aside, in 1761, by the Commissioners of the ‘1 publick landing ’ ’ constituted an easement or dedication and not a title in fee to the town. In support of this position they cite Bradley v. Crane (201 N. Y. 14), Porter v. International Bridge Co. (200 N. Y. 234) and Beth-Israel Hosp. Assn. v. Moses (275 N. Y. 209).
Bradley (supra) was an action for specific performance. It involved a portion of the former Bloomingdale Road in the Borough of Manhattan, the width of which was reduced, at one time, from four to two rods. In 1907 the parties stipulated that if a designated instrument of March 24, 1795 conveyed a fee of a portion of the highway to the City of New York — and not a mere easement — then the city’s title was good, and specific performance would follow.
At page 24, the decision noted that: ‘ ‘ The language of the instrument, like that of the statute of 1787, was capable of transferring a fee or an easement. It did not definitely specify the character and nature of the estate conveyed.”
And again, at page 25:
‘ ‘ The intention and purpose of the parties did not necessitate the conveyance of the fee of the land, and would be completely fulfilled by the easement therein of the free and common right of way to the public, with the powers and privileges incident thereto. Such was the estate of the city in the two rods of the then existing road, and such was the estate acquired gen *718 erally for public roads and highways under the common law. There is nothing inconsistent in the public use of land as a road and the retention by the landowners of the fee, subject to the easement.
“We must construe the language of the instrument, which transfers the property for public use in lieu of condemnation proceedings, strongly and strictly in favor of the landowners. The law will not, by construction, effect through the instrument a grant of a greater interest or estate than was essential to the public use for which the grant was sought. No implication is permissible that the instrument granted an estate greater than was absolutely necessary to satisfy its language and object.”
In Porter (supra) in the year 1830 eight owners of certain real property in the Village of Black Bock, later incorporated in the City of Buffalo, set aside an open space for a “ public square ”. In 1870 the Common Council of the city gave defendant permission to use it for bridge approach purposes, but no physical action was taken in pursuance of such permission until a few years later. On a suit by the successors of the original octet to enjoin a continuing trespass, the complaint was held to state a cause of action, and in response to four questions certified to it by the Appellate Division, the Court of Appeals rendered a decision that (1) plaintiff had standing to sue; (2) that the manner of use by the defendant was not consistent with the prescribed use as a public square; (3) that the city had abandoned the premises as a public square; and (4) that no prescriptive rights had been acquired by the defendants, or either of them.
In so holding the court observed (p. 245): “The effect of the dedication of the land designated as a public square * * * in 1830 was to create an easement in favor of the public, co-extensive with the purposes to which public squares in such localities are usually applied.”
And at (p. 246): “ It was not necessary that the fee of the land should pass in order to secure the easement to the public. (City of Cincinnati v. White’s Lessee, 6 Peters, 431.) The naked fee remained in the original proprietors and their successors in interest. This is not like a case where the acquisition of a fee is essential to carry out the purpose which the parties making the dedication had in view, or where land is taken in the exercise of the power of eminent domain under a statute which obviously contemplates obtaining the largest title possible.”
And further (p. 250): “The original owners gave an easement to the city. The city has abandoned that casement and *719 turned the property over to third parties. When the easement was thus effectually abandoned, the rights of the original owners became precisely what they were prior to the dedication. ■ They or their successors in title could thereafter deal with it as owners in fee simple absolute, and they were damaged by the gratuitous occupation of the premises by the bridge and railroad company.”
Of even more ancient vintage — and more hoary in its inception than the case at bar — is that of Beth Israel (supra). For it harks back to the regime of “ Peg-leg ” Peter Stuyvesant, who, in 1651, took title by patent to the area there in dispute. In 1836 a lineal descendant of the same name conveyed the subject premises to 'the City of New York with a proviso that it was to be (pp. 213-214): “ used exclusively for the purpose of a public square * * * and in case the said lands * * * should at any time hereafter cease to be used for the purpose of such Public Square * * * then these presents and everything herein contained shall be void and thereupon the parties hereto of the first part or their heirs, shall and may lawfully re-enter in and upon the said premises hereby granted and every part and parcel thereof and hold the same as of their former estate ”.
Defendant claimed the dedication would permit the placement within the square of playgrounds for the neighborhood children. To this the hospital took strenuous exception, complaining that the noise generated by children would have a deleterious effect on the health of its patients.
At page 212 the court noted that: “ The only issue before us is whether the covenants and conditions written into this grant are such as to compel the city to maintain Stuyvesant Square as an ornamental or parklike square and preclude the Commissioner of Parks from establishing playgrounds therein. ’ ’
Commenting on the issue, and citing Bradley (supra) it said (p. 221): “ A deed of dedication which is ambiguous must be construed in favor of the grantor and those who take under him.”
Having these three cases in mind, we may well ask the question : Assuming the town took title and possession for a specific use, may it now convert it into a general use after abandonment of the specific? — or is there a reverter to the original owners?
We know that the signers had named Commissioners in the 1735 agreement. They noted therein as well: “ We also agree that good and lawful deeds made by our grandfather Richard Smith shall stand good, which said men are to have all deeds to lay out by, and whereas their is occupation deeds by our *720 Grandfather Smith granted to his sons wee allow them to be good as far as evidence and surcumstances shall prove was in each persons possession and improvement att the time when given and granted, and also our grandfather’s will
By this agreement they appeared to be doing nothing more or less than selecting referees to partition the undivided lands among the Smith heirs in a just and equitable manner.
Within a short time after the execution of the 1735 agreement the Commissioners referred to the signers as ‘ ‘ freeholders, proprietors and dividers ”. From this are we to assume that, because they are now styled 1 ‘ proprietors ’ ’ in addition to the other epithets, they have suddenly assumed the trappings and regalia of town authorities, and are thus vested with municipal rights as such? If so, again may we ask, why were not the town officers made parties, or why was there no reference to setting aside all or some of the parcels of land to the sole use and behoof of the town?
In asserting their reverter rights because of an unconsummated dedication, it would, in the usual course of events, be incumbent upon defendants to demonstrate an actual abandonment of the ‘1 landing ” as a prerequisite to re-entry. This problem the plaintiff has spared them, for plaintiff concedes that when the Long Island Rail Road came through in the eighteen seventies, the landing was eventually and effectually abandoned. Thus we know that it had outlived its usefulness and had lapsed into innocuous desuetude well nigh a century before the action at bar first saw the light of day.
No one disputes that the defendants have been in physical possession for an appreciable length of time. Thus the town is in the position of a plaintiff in an ejectment action who is out of possession. To prevail in an article 15 of the Real Property Actions and Proceedings Law proceeding, a plaintiff must demonstrate good title in himself. He may not rely on the weakness of his adversary’s title. (Best Renting Co. v. City of New York, 248 N. Y. 491.)
Plaintiff has failed to bear its burden by a fair preponderance of the credible evidence. Hence its complaint is dismissed, without costs.
This brings us to the answers interposed by the defendants. Many of them had adopted the ploy of using adverse possession as both a shield and a sword: — as an affirmative defense and as a counterclaim. All of them, however, with the exception of defendant Sprofera, withdrew the counterclaim at the time of trial and she offered no testimony in support of her position.
Thus the court leaves the parties as it found them.
*721 So much of the text of W. S. Pelletreau (Records of Smithtown, Long Island, N. Y.) as the court considered necessary for the decision is deemed received and marked in evidence.
This constitutes the decision of the court pursuant to CPLR 4213 and all motions or objections on which decision was reserved are resolved accordingly.